UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

| | | |
|---|---|---|
| DAVID CRAWLEY, | ) | |
| | ) | CIVIL ACTION |
| Plaintiff, | ) | |
| | ) | No. |
| vs. | ) | |
| | ) | |
| CBS CORPORATION, KDKA-TV, and | ) | JURY TRIAL DEMANDED |
| WPCW-TV, | ) | |
| | ) | |
| Defendants | ) | |

## CIVIL COMPLAINT

David ("Dave") Crawley, by undersigned counsel, files this Civil Complaint and in support alleges the following:

I.   Introduction

1.      In August of 2017, CBS placed Dave Crawley in a position of peril, subjecting him to catastrophic injury in order to satisfy powerful outside influences. When Mr. Crawley began to use the only mechanism available to him to replace part of the income he had lost and assist in paying for mounting medical bills, i.e., workers' compensation, CBS retaliated, beginning a process of erasure that has left Dave Crawley's Pittsburgh viewership wondering why he disappeared.

Discrimination and disenfranchising vulnerable employees is endemic amongst CBS owned and operated (O & O) stations.  Across the country in cities such as New York, Miami, Chicago, Dallas, and Los Angeles, David vs. Goliath battles have arisen between reporters and CBS as victims of illegal behavior fight against the culture of fear and retaliation propagated by the highest levels of CBS—a corporate mindset that has filtered down into CBS-owned stations, including Pittsburgh's KDKA.

1

Indeed, Scott Pelley, an anchor at CBS National News, has explained that he was thrown off the air for voicing his concerns about hostility in the workplace: "I lost my job at the evening news because I wouldn't stop complaining to management about the hostile work environment." Pelley reported the truth when he said those words in multiple interviews, describing a "dark period" that included multiple instances of discrimination and retaliation directed at vulnerable employees. https://www.newsweek.com/why-scott-pelley-fired-cbs-evening-news-les-moonves-1436501. It started at the top; an LA Times investigation and numerous other media, e.g., Fortune Magazine, reported the toxic culture that spread and infected the O&O stations – loyal employees, who had grown older, were victims of discrimination and retaliation perpetrated in heartless ways. CBS's callous behavior is contrary to its feel-good, carefully crafted, public relations mantra "CBS Cares." www.latimes.com/entertainment-arts/business/story/2019-12-08/cbs-tv-stations-toxic-culture ; https://fortune.com/2019/12/09/ousting-moonves-didnt-fix-everything-at-cbs/ .

Dave Crawley never imagined that he would have to file a lawsuit hoping to protect himself or seek payment of his medical bills related to his work-injury. Dave's career came to a screeching halt, however, when his health, career, livelihood, and reputation were destroyed by a CBS assignment.

Dave's employer assigned him to promote the "cornerstone" Red Bull Flugtag event for The Pittsburgh Regatta's 40th Anniversary in 2017, billed as "really special" and "the best one yet" because of the Flugtag. Over the course of approximately five months, Dave fulfilled three Flugtag assignments unwaveringly, as he had with dozens of family-friendly Regatta stories over the years. But in August of 2017, KDKA added a fourth, last-

minute Flugtag assignment; Dave would be jumping from the end of 22-foot high pier on a

contraption. Dave did not see the actual "contraption" until minutes before he "took flight"

that was designed to promote the Flugtag event the following day, which celebrated the

opening of this 40th Anniversary Regatta.  https://archive.triblive.com/local/pittsburgh-

allegheny/red-bull-flugtag-soars-into-eqt-pittsburgh-three-rivers-regatta-lineup/.  With no

choice, Dave completed this last-minute assignment, but he was severely injured as a

result.

Red Bull and the Regatta knew the "flight" was inherently dangerous as they were

aware of numerous "pilots" throughout the world who have been seriously injured in

*Flugtag* but did not disclose this during the News Conference at which KDKA assigned

Dave to cover the upcoming event.

Because he was injured on the job, Dave's only recourse to pay for the emergency

life-saving surgery, Trauma Intensive Care, and mountains of unexpected medical bills,

was to file a workers' compensation claim.  But as a result of his workers' compensation

claim and his EEOC complaint, CBS retaliated against him. CBS has aggressively fought

and continues to fight to deny Dave Crawley workers' compensation and employment

rights, including payments for necessary medical treatment.

CBS's retaliatory conduct included, but was not limited to: CBS stopped paying

Dave's medical bills two months after he nearly died; CBS did not renew Dave's

employment contract; CBS eliminated his work email account without any warning; CBS

stripped away benefits such as a life insurance policy despite Dave paying into it for 30

years; and CBS intentionally eliminated him from public view—effectively erasing him

from Pittsburgh viewership.  Unlike another much younger CBS O & O personality (Craig

3

Setzer) who, unbeknownst to Dave had been seriously injured in a prior Flugtag event, Dave was treated very differently because of his age. Craig Setzer was promoted after his injury, while Crawley was abandoned, disregarded and retaliated against by CBS.

II.  Jurisdiction

2.  This Honorable Court has subject matter jurisdiction over the causes of action below pursuant to 28 U.S.C. §§ 1331 because Plaintiff states questions under federal law. At issue are claims made pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA") 29 U.S.C. § 621, *et. seq*. This Honorable Court has pendent jurisdiction over Plaintiff's state law claims of violation of the Pennsylvania Human Relations Act ("PHRA") and workers' compensation retaliation pursuant to 28 U.S.C. § 1367.

3.  Plaintiff has exhausted his administrative remedies. Plaintiff dual filed a claim of age discrimination with the EEOC and PHRC on May 29, 2018. An amended complaint alleging retaliation was filed on June 13, 2019. CBS filed a response to both charges on October 9, 2019. The EEOC issued Right to Sue Notifications to Plaintiff on December 4, 2019. This action is timely filed.

III.  Venue

4.  Pursuant to 28 U.S.C. §1391(b)(1) and (b)(2), venue is properly laid in this district because Defendants regularly conduct business in this district, and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district. Plaintiff was working for Defendants in Allegheny County, which is within the Western District of Pennsylvania, at the time of the illegal actions of the Defendants set forth herein.

III.  The Parties

4

5.      Dave Crawley resides in Pittsburgh, PA.

6.      CBS Corporation and its member companies, including CBS Broadcasting, Inc. ("CBS"), are located at 51 West 52nd Street 35, New York, NY. CBS is a publicly traded company engaged in a broad range of media businesses, including thirty owned and operated television stations. CBS owns and operates KDKA-TV ("KDKA") and WPCW-TV, located in Pittsburgh.

7.      CBS told the EEOC, in response to Dave Crawley's age discrimination and retaliation complaints that CBS maintains and enforces policies against discrimination and harassment in the workplace. CBS claimed that its policies prohibit discrimination and expressly forbid retaliation against any individual who raises a complaint of harassment or discrimination. CBS claimed that its EEO Policy "emphatically supports equal employment opportunity without discrimination on the basis of disability, age and all other protected categories."

8.      While CBS claimed that it maintains and enforces Anti-Discrimination and Anti-Harassment policies, such that CBS would never allow its employees to suffer illegal discrimination, harassment or retaliation, CBS has a history and pattern of engaging in illegal discrimination, harassment and retaliation.

9.      CBS's claim that it maintains and enforces policies that prevent discrimination, harassment and retaliation, of course comes from the company that had at its helm, Leslie Moonves and prominently featured its news anchor, Charlie Rose. Messrs. Moonves and Rose clearly failed to read or follow CBS's policy. The New Yorker Magazine, "As Leslie Moonves Negotiates His Exit from CBS, Six Women Raise New Assault and Harassment Claims," By Ronan Farrow, September 9, 2018,

https://www.newyorker.com/news/news-desk/as-leslie-moonves-negotiates-his-exit-from-cbs-women-raise-new-assault-and-harassment-claims.

10.     Former CBS Evening News anchor, Scott Pelley, has stated publicly that he lost his job in retaliation for repeatedly reporting the hostile work environment at CBS. Pelley stated: "we've been through a dark period of the last several years of incompetent management and sort of a hostile work environment within the news division." People Magazine, "Scott Pelley Says He 'Lost' Job at CBS Evening News After Complaining about 'Hostile' Environment," May 27, 2019; Newsweek Magazine, "Why Scott Pelley Says He Was Fired From 'CBS Evening News,'" May 26, 2019, https://www.newsweek.com/why-scott-pelley-fired-cbs-evening-news-les-moonves-1436501.

IV.     Factual Background

11.     Dave Crawley is a 72-year old male who lives in Pittsburgh, Pennsylvania.

12.     Crawley graduated from Washington and Lee University with a B.A. in English and from Emerson College with an M.A. in Mass Communications.

13.     Crawley has more than 40 years of experience in the television industry.

14.     From 1980 until 1988, Crawley worked as news anchor and reporter for WMTV-TV, an NBC-affiliated television station in Madison, Wisconsin.

15.     In April 1988, CBS hired Crawley to work at KDKA, where he has worked for 30 years as a Special Assignments Reporter, focusing on human interest stories and high-profile events.

16.     During his career, Crawley has taped more than 6,000 stories and won numerous awards, including 13 *Emmys* (three for "Outstanding Feature Reporter" and two

for "Outstanding News Features Series") in the Mid-Atlantic, the *Edward R. Murrow Award* for broadcast news writing, the *Bill Burns Award* for journalistic excellence, and numerous Associated Press and Golden Quill awards, among many other honors.

17.    At work and on his personal time, Crawley has often represented KDKA at charities and public service events, including the Juvenile Diabetes Research Foundation, Alzheimer's Association, and Pancreatic Cancer Action Network, among other groups.

18.    Crawley is also an accomplished poet and author of children's literature, with four published books of child poetry, including *Dog Poems*, named one of *The Best Children's Books of the Year* by the Bank Street Children's Book Committee. His poems have appeared in numerous children's magazines and anthologies, and he was the 2013 winner of the *March Madness of Children's Poetry*.

19.    In 2008, on Crawley's 20th anniversary at KDKA, City Council declared "Dave Crawley Day" in Pittsburgh.

20.    As Crawley has grown older, KDKA has assigned younger reporters to stories that Crawley had been typically assigned and was still ready, willing and able to cover – even when he already had a professional connection to the story – due to his age. By way of example,

    a)    A producer told Crawley he wasn't "hip" enough to cover youth-oriented or "edgy" topics any longer, even though he did so for years;

    b)    KDKA rejected his legitimate, even compelling, story suggestions (e.g. story of the son of a local man who piloted the Enola Gay and dropped the bomb on Hiroshima) and told him to find something more "hip";

    c)    KDKA rejected him for a story on a song by Pittsburgh rapper Mac Miller about a Point Breeze market that Crawley knew well. Dave Crawley was told in front of his co-workers at a morning meeting: "No offense, Dave, but this is not a story for you;" and

7

d) Though Crawley's rhyming stories won several *Emmys* and numerous accolades, a producer significantly reduced the number of them, indicating that younger viewers would not like them.

21.     Dave Crawley experienced decreased respect from management and lesser quality assignments because of his age. CBS corporate managers were after the coveted 18-35-year-old viewer demographic. Dave's story ideas once enthusiastically supported were routinely rejected and ridiculed. In morning meetings, ideas from veteran reporters were often ignored or quickly dismissed in a humiliating fashion.

22.     Older reporters at KDKA were often ignored, passed over, and their ideas were sometimes dismissed and mocked.

23.     CBS recently attempted to rid itself of older employees through forced buyouts.

24.     CBS and KDKA's branding changed from one touting its respected veteran reporters, i.e. the "hometown advantage," to one that focused on fresh youthful faces. Consultants urged CBS and KDKA to rebrand with younger reporters to capture younger "eyeballs."

25.     KDKA has a history of age discrimination. Age discrimination claims have been brought by older television reporters, among them, the Pittsburgh icon, Patti Burns.

**KDKA Assigned Crawley to Take a Long Walk Off a Short Pier**

26.     KDKA was a major sponsor of the EQT Pittsburgh Three Rivers Regatta ("Regatta"), an annual event featuring races, stunts, water-related and other activities in Pittsburgh's rivers.

27.     KDKA typically prepares and airs multiple promotional pieces featuring the Regatta and its various events.

8

28.     KDKA was a major sponsor and promotor of the 2017 40th Anniversary celebration of the Regatta.

29.     Among the events featured at the 2017 Regatta was *Flugtag* (German for "flight day"), put on by Red Bull GmbH "("Red Bull") to promote its "energy drink" and brand.

30.     Five-person *Flugtag* teams (including "pilots") design and/or construct "contraptions" that are launched from the 22-foot high Red Bull Pier into a body of water.

31.     To promote the station as a sponsor of the 2017 Regatta and the Regatta itself, KDKA initially assigned Crawley a series of three preview stories.

32.     The first story announced the event and solicited "pilot" participants.

33.     The second and third stories covered design and construction of *Flugtag* "contraptions."

34.     A few days before the event, Red Bull's representative, M&C Saatchi ("MCS"), contacted KDKA, suggesting another preview story with a KDKA on-air personality to "take flight" on a "contraption" off the 22-foot high Red Bull Pier into the river below.

35.     A few days before the event, KDKA assigned Crawley a fourth story, requiring him to "take flight" on a "contraption" off Red Bull's 22-foot high Pier into the river.

36.     Crawley was surprised that KDKA assigned him to "take the flight" and did not expect to be an actual participant.  The assignment was unusual and outside the norm, considering the assignments and statements referenced above.

9

37.     Red Bull, through its promoter, MCS, told KDKA that we "promise we'll hook you guys up nice for making that work."

38.     As explained above, since KDKA has limited Crawley's story opportunities as he has grown older, and/or refused to assign stories to him because of age, Crawley felt that he had to accept the assignment to "take the flight."

39.     Crawley knew that if he turned down the assignment there would be retaliation. He feared that if he turned this assignment down, CBS and KDKA might conclude that he "couldn't cut it" due to his age.

40.     Red Bull representatives directed Crawley to view a short video, purporting to be representative highlights from various *Flugtag* events and that portrayed the event as safe, harmless fun.

41.     Red Bull's promoter, MCS, told KDKA to pick one of two "media craft" designs – a ketchup bottle or the Stanley Cup.

42.     After Crawley was shown drawings of the crafts, he chose the Stanley Cup, which depicted a flat surface for the "pilot" so he could jump feet first.

43.     Crawley did not see the actual "contraption" until minutes before he "took flight".

44.     Unlike Crawley, a number of the volunteer "pilots" were athletes, and all of them were familiar with their "contraptions," having participated in designing and building them, and practiced to "take flight" for months in advance.

45.     Crawley had no practice before he "took flight" and received only brief and useless instructions from Red Bull representatives running the event.

46.    The "flight" was a catastrophe and Crawley did not land feet first; he landed face first and suffered blunt force trauma.

47.    Though Crawley did not feel well, he returned to work for ten days, during which time, he ran a fever. He missed one day of work.

48.    On August 21, 2017, Crawley collapsed while covering a story.

49.    Crawley was rushed to the hospital, where it was discovered that his spleen had been ruptured in the "flight."

50.    Crawley sustained a ruptured spleen and post-splenectomy syndrome, concussion, brain injury, pulmonary injuries, a partially paralyzed left diaphragm, and mild to moderate excessive daytime sleepiness, as a result of KDKA's assignment to "take flight."

51.    Since his surgery on August 21, 2017, Crawley has been unable to return to work and no one at CBS or KDKA has made mention of Crawley on the air, which is again, outside the norm.

52.    Since release from the hospital, Crawley has undergone various therapies – pulmonary, physical, vestibular and cognitive – trying to recover sufficiently to return to work.

53.    Before his injury, Crawley planned to continue working into his 80s.

54.    Since the injury, KDKA has urged Crawley to voluntarily resign.

55.    Since the injury, KDKA did not renew Crawley's contract.

56.    CBS treated Crawley very differently than it treated a much younger meteorologist from Miami who was injured in the *Flugtag*. Craig Setzer was promoted after his injury, while Crawley was abandoned, disregarded and retaliated against by CBS.

11

57.     Red Bull and the Regatta knew the "flight" was inherently dangerous as they were aware of numerous "pilots" throughout the world who have been seriously injured in *Flugtag*. Among the injuries that have been reported are:

a)     In 2010, a 26-year-old woman in Bucharest fractured her back and required surgery from a "flight";

b)     Another Bucharest "pilot" suffered cranio-cerebral trauma and cervical spine injuries;

c)     In July 2011 in Trinidad, *Flugtag* spectators died, among them a 14-year-old boy whose mother helplessly watched him drown;

d)     In 2013, a CBS Meteorologist "pilot" in Miami suffered spinal injuries requiring surgery;

e)     In September 2016, the "pilot" of a team of MIT Aerospace engineers fractured his hand in a failed "flight";

f)     Three months before the February 2017 EQT Regatta News Conference announcing the upcoming Pittsburgh event, 14 people were injured in Hong Kong, including a 23-year-old TV host, four were hospitalized;

g)     The day after Crawley's injury, another Pittsburgh "pilot" was knocked unconscious and hospitalized, and three others were injured; and

h)     On at least two occasions, in Portland and Chicago, *Flugtag* was cancelled for safety reasons, including once by the Coast Guard.

58.     Six deaths and multiple injuries are depicted in the German documentary,

*The Dark Side of Red Bull – The Perils of Extreme Sport.*

59.     No one involved in the event, disclosed the history of prior injuries or inherent danger to Crawley before he "took flight."

60.     On December 15, 2017, Crawley filed a workers' compensation claim. Throughout the remainder of 2017, 2018 and 2019, CBS vigorously contested Crawley's workers' compensation claim.

61.     In its response filed with the EEOC, CBS falsely claimed that Crawley refused to provide CBS with medical information concerning his injuries.

## CBS Erases a 30-Year Employee from Its History

62.     January 11, 2019, marked seventy (70) years since KDKA went on air in 1949. In recognition of seventy (70) years, KDKA produced and aired three (3) segments over three (3) news casts, which collectively were entitled "KDKA-TV 70 Years 1949-2019."

63.     The three segments that comprised the 70 Years Show and length of each were:

1st:    KDKA-TV Celebrating 70th Anniversary - 7 min 26 sec
2nd     Remembering KDKA's Newscasters on Our 70th Anniversary - 6 min 25 sec
3rd:    Reflecting on KDKA's Biggest News Stories Over the Past 70 Years - 8 min 20 sec

64.     KDKA extended viewer reach of the 70 Years Show by posting the three segments that comprised it online, including on CBS-KDKA's website, YouTube and msn.com. https://pittsburgh.cbslocal.com/2019/01/11/kdka-tv-70th-anniversary/

65.     The 70 Years Show was a narrative history of KDKA-TV with segments and clips from programming going back to 1949, which showcased current and former featured reporters and other on-air personalities.

66.     The 70 Years Show incorporated content from an earlier KDKA program called "Celebrating 50 Years in Our Hometowns" (the "50th Anniversary Show").

67.     Crawley had a primary role in creating and airing the 50th Anniversary Show.

*       Crawley was primary producer (a photographer co-Produced);

13

* Crawley and his co-Producer spent months locating and curating content;

* Crawley wrote the script;

* Crawley narrated the show; and

* Crawley was prominently featured in the show.

68. The 50th Anniversary Show won an EMMY.

69. KDKA sold the 50th Anniversary Show to the public and presented each KDKA employee with a copy as a Christmas gift.

70. Like the 50th Anniversary Show, "The 70 Years Show" featured reporters considered "legends" or "pioneers" in local television.

71. Crawley fits within both categories. By way of example, the National Academy of Television Arts and Sciences ("NATAS") inducted Crawley into its Mid-Atlantic Silver Circle for contributions to the industry over 25 years. For purposes of comparison, only two other KDKA on-air broadcasters have achieved this status since 2014.

72. Unlike the 50th Anniversary Show, where Crawley was prominently featured, he appears only once in the 70 Years Show – in a blurry group photo.

73. The 50th Anniversary Show featured several segments originally written, produced and narrated by Crawley.

74. As noted, material from segments that comprised the 50th Anniversary Show were also used in the 70 Years Show – but some were rewritten, shortened and/or edited to remove Crawley's narration and likeness.

75. Several KDKA reporters featured in the 70 Years Show were less tenured or not as accomplished or prominent as Crawley was in KDKA's TV history.

14

76.   Crawley joined KDKA-TV in the 1980s and was among a cohort of reporters at the station who, over time, became well-known and highly regarded in the Pittsburgh market.

77.   Crawley's cohort included reporters Harold Hayes, Mary Robb Jackson, Lynne Hayes Freeland, Ralph Ianotti, Paul Martino, John Shumway, Brenda Waters and Stacy Smith, all of whom, unlike Crawley, were specifically named and honored in the 70 Years Show.

78.   Also included in his cohort were feature reporters Al Julius, Wayne van Dine, Lynne Sawyer, Bill Flanagan, and Yvonne Zanos, each of whom, like Crawley, occupied a specialized reporting *niche* in the Pittsburgh market, and who, unlike Crawley, were specifically identified individually and roundly praised during the 70 Year Show.

79.   For example, Brenda Waters' feature program, "On a Positive Note," which ran for several years, was prominently featured in the 70 Years Show.

80.   By contrast, Crawley's feature stories, often titled "KD Country" which occupied a similar space in KDKA's programming, and which ran for decades, was not mentioned on the 70 Year Show, although it encompassed more than 6,000 stories, won 12 EMMYS and KDKA compiled and sold a stand-alone video featuring Crawley's stories.

81.   Although the 70 Years Show highlighted the involvement of KDKA on-air personalities in charity and community events, Crawley's considerable involvement in these activities was omitted.

82.   Although the 70 Years Show highlighted the involvement of KDKA on-air personalities with children, it omitted Crawley's considerable involvement with schools, libraries and children's events.

15

83.     At the conclusion of the 70th Anniversary Show, KDKA thanked several employees as "Producers," though their contributions to that show were relatively modest, while omitting mention of Crawley despite his substantial contribution to it.

84.     KDKA's elimination of any trace of Crawley from its history, as portrayed in the 70 Years Show, is tantamount to a *Damnatio Memoriae* – the ancient Roman punishment of erasing from all official documents and histories the name of someone deemed to have dishonored the Roman state – and damaged Crawley's professional reputation. The retaliatory omission has caused Crawley significant emotional and mental anguish.

85.     KDKA-TV's omission of Crawley from the 70 Years Show was in retaliation for Crawley having engaged in "protected activity" by filing the above-referenced EEOC and workers' compensation charges.

86.     KDKA-TV's omission of Crawley from the 70 Years Show has harmed him personally and professionally. Excluding him was intended to and did create the impression that he was not among the station's "major newscasters" and did not cover "major news events." Nor did KDKA explain that Crawley has been absent from the station because he was seriously injured on the job while performing a news assignment, as is routinely done when other newscasters are ill or injured. KDKA's failure to explain Crawley's absence and the reasons for it, along with KDKA's attempts to erase Crawley from its history, have caused viewers (a number of whom have asked) and the public to wonder what happened to Crawley or to assume the worst.

87.     As a result of the above-described conduct, KDKA has harmed Crawley's professional reputation with colleagues, other media professionals and prospective

employers who would otherwise consider him for freelance work, including, but not limited to, writing, broadcast, voiceover, public speaking engagements, presentations, and Emcee activities.

88.     As a result of KDKA-TV's retaliatory conduct as set forth above, Crawley has suffered emotional distress and personal humiliation and harm to his good name and his "brand," which he built over a 30-year KDKA career.

### Other Age Discrimination at CBS

89.     In 2017, the EEOC sued CBS for age discrimination after the EEOC determined that an older traffic reporter was discriminated against because of her age at one of CBS's owned and operated television stations (CBS 11) in Dallas, Texas.  Tammy Campbell was passed over for a job because the station wanted a younger face, according to the EEOC.  Campbell, 42, was passed over for a less-qualified 24-year-old, former Arizona Cardinals cheerleader who did not meet the minimum qualifications of the job posting.

90.     Michele Gillen, a journalist at an affiliate of CBS, and recipient of over two dozen regional Emmy awards, filed an age and gender discrimination lawsuit in 2018 against CBS claiming that she was subjected to discriminatory comments and overlooked for important projects simply because she was a woman and an older employee.  After Ms. Gillen complained to CBS's HR Department, CBS removed Ms. Gillen as the anchor of the CBS show "Focus on South Florida."

### CBS's Rampant Harassment and Retaliation

91.     In September of 2018, CBS announced the names of 18 groups, including Times Up, that would share in CBS's $20 million donation stemming from the exit of its chief executive, Les Moonves, following allegations of sexual misconduct.

92.     The bad behavior at CBS was not limited to Moonves.  Numerous examples of outrageous behavior, discrimination and retaliation were identified in the complaint filed by Cassandra Vinograd[1], a 60 Minutes producer, against CBS on December 17, 2019.  For example:

- Thirty current and former CBS employees told Ronan Farrow, a reporter at The New Yorker, that reprehensible behavior, such as that engaged in and tolerated by Moonves, infected other parts of CBS, including CBS News and 60 Minutes. Farrow's investigative work shows that CBS's pattern was to obtain promises of blanket silence by the female victims in return for money, and thereafter go on to promote a number of men accused of sexual misconduct.  Farrow's reporting also revealed the following:

- Jeff Fager, the former chairman of CBS News, and Executive Producer for 60 Minutes, was accused of sexual harassment by 19 current and former female employees.  Fager was accused of, *inter alia*, getting drunk at company parties and touching female employees inappropriately.

- Fager had a reputation for protecting men accused of misconduct who reported to him.  Specifically, he protected Michael Radutzky, a Senior Producer at 60 Minutes with a reputation of being "out of control," after he allegedly threatened to throw furniture at a female colleague and twisted the woman's arm behind her back, causing her to scream.  After discouraging the female employee from reporting that incident to HR, Fager allegedly asked the female employee to apologize to Radutzky to avoid conflict in the office.  In response to a request for his comment on the matter, Fager told CBS correspondent, Jericka Duncan, to "[b]e careful. There are people who lost their jobs trying to harm me." www.washingtonpost.com/news/arts-and-entertainment/wp/2018/09/12/60-minutes-chief-jeff-fager-leaves-cbs-amid-harassment-accusations/

- Habiba Nosheen, a former journalist at 60 Minutes, complained to management that Ira Rosen, a producer for the program, directed numerous sexual comments at her and that he suggested that Ms. Nosheen flirt with sources.  Ms. Nosheen met with Fager and Fager assured Ms. Nosheen that she did not have to worry about

---

[1] Vinograd's complaint contains footnote citations not set forth herein.

Rosen harassing other women. Subsequently, CBS retaliated against Ms. Nosheen by blocking her from future assignments. Days after Ms. Nosheen complained to Fager, Fager mandated that Ms. Nosheen attend a meeting with him and two of his deputies. In the meeting, Fager wrongfully criticized Ms. Nosheen's work performance in what Ms. Nosheen interpreted to be an obvious attempt to retaliate against her for making a protected complaint.

- Charlie Rose ("Rose"), a former co-anchor for the network's morning show, CBS This Morning, and frequent contributor for 60 Minutes, was accused by numerous female colleagues of egregious sexual harassment that spanned decades. For example, Rose was accused of, *inter alia*, (i) placing his hand on female employees' legs and upper thigh, (ii) exposing his penis to female employees who were working at his residences or traveling with him, (iii) groping a female employee by grabbing her buttocks during a staff party, (iv) calling a 21-year old female employee late at night and early in the morning to describe his fantasies of her swimming naked in his pool, and (v) groping a female colleague's breasts and stomach while she was driving him from his residence in Bellport, New York to Manhattan.

- In December 2018, CBS paid actress Eliza Dushku, $9.5 million to resolve her allegations of sexual assaults that she experienced by Michael Weatherly on the set of CBS series Bull. In one incident caught on tape, Ms. Dushku fumbled her line, prompting Weatherly to shout, "I will take you over my knee and spank you like a little girl." CBS, settling with Dushku, has allowed Weatherly to reprise his role on Bull.

- In March 2018, Jill Arrington, a former CBS News anchor, met with CBS executives about a renewal of her contract and complained that she was being paid substantially less than her male counterparts. In response to Ms. Arrington's complaints, Steve Mauldin, the former General Manager of CBS's Los Angeles stations, stated, "Oh, isn't she tough" and "[t]his one talks more than my wife." As Ms. Arrington was walking out of the meeting, Mauldin told her to "[p]ut on a tennis dress and meet me at the golf club. We'll put you on tape, and you can make some extra money." Later that year, CBS terminated Ms. Arrington's employment citing, "budget cuts."

- Leyna Nguyen, a former KCBS-KCAL anchor and 20-year CBS employee, complained in July 2018 about inappropriate comments and unwanted touching by a male colleague at CBS. Although the alleged wrongdoer was let go, CBS paid him severance. The same former CBS employer that assaulted Ms. Nguyen, also propositioned Gwendolyn Gatti, CBS's former head of make-up for sex, slapped Ms. Gatti on her buttocks and asked her about her sex life.

## COUNT I – AGE DISCRIMINATION - ADEA

93.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully restated herein.

94.     Plaintiff was discriminated against and treated differently than younger employees as stated herein.

95.     Defendants' stated reasons for the actions taken against Plaintiff are a pretext for age-discrimination.

96.     Defendant violated the ADEA by discriminating against Plaintiff and refusing to renew his contract because of his age and his complaint of age discrimination.

97.     Defendant willfully violated the ADEA.

WHEREFORE, Plaintiff seeks a judgment against Defendants, including the following:

(a)     Payment of back wages, front pay, and benefits;

(b)     Liquidated damages; and

(c)     Costs of litigation and reasonable witness and attorney fees; and

(d)     Such other relief as the Court deems just and proper under the circumstances.

## COUNT II - THE PENNSYLVANIA HUMAN RELATIONS ACT (PHRA)

### Age Discrimination

98.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully stated herein.

99.     The PHRA prohibits discrimination based upon the age of an employee.

100.   Defendants discriminated against Plaintiff because of his age as more fully described herein. Defendants' discrimination was in violation of the PHRA.

101.   Defendants' alleged reason for the discrimination against Plaintiff is a pretext for illegal discrimination.

102.   Defendants' unlawful employment practices caused Plaintiff to suffer damages including but not limited to lost income, lost benefits, embarrassment, inconvenience, diminution of his public persona, emotional distress, and mental anguish.

103.   Defendants' deliberate discrimination against Plaintiff is unlawful discrimination and is in violation of the PHRA.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, plus costs of this action, reimbursement of back pay with interest, front pay, attorneys' fees, and such other relief as the Court may deem just and proper under the circumstances.

## COUNT III – ADEA- RETALIATION

104.   Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully restated herein.

105.   Plaintiff was retaliated against as stated herein.

106.   Defendants' stated reasons for the treatment of Plaintiff and/or erasure of Plaintiff from public view are a pretext for its retaliation.

107.   Defendants violated the ADEA by retaliating against Plaintiff through *damanatio memoriae* and refusal to renew his contract because of his complaint of age discrimination.

108.     Defendants willfully violated the ADEA.

WHEREFORE, Plaintiff seeks a judgment against Defendants, including the following:

      (a)    Payment of back wages, front pay, and benefits;

      (b)    Liquidated damages; and

      (c)    Costs of litigation and reasonable witness and attorney fees; and

      (d)    Such other relief as the Court deems just and proper under the circumstances.

## COUNT IV - THE PENNSYLVANIA HUMAN RELATIONS ACT (PHRA)

### Retaliation

109.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully stated herein.

110.     The PHRA prohibits retaliation based upon the complaints of age discrimination by an employee.

111.     Defendants retaliated against Plaintiff because he reported age discrimination.  Defendants' retaliation was in violation of the PHRA.

112.     Defendants' alleged reason for the retaliation against Plaintiff is a pretext for illegal retaliation.

113.     Defendants' unlawful employment practices caused Plaintiff to suffer damages including but not limited to lost income, lost benefits, embarrassment, inconvenience, diminution of his public persona, emotional distress, and mental anguish.

114.     Defendants' deliberate retaliation against Plaintiff is unlawful and is in violation of the PHRA.

22

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, plus costs of this action, reimbursement of back pay with interest, front pay, attorneys' fees, and such other relief as the Court may deem just and proper under the circumstances.

## COUNT V - WORKERS' COMPENSATION RETALIATION

115.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully stated herein.

116.    Pennsylvania public policy prevents employers from retaliating against employees for filing workers' compensation claims and seeking workers' compensation benefits.

117.    Defendants retaliated against Plaintiff because he filed a workers' compensation claim and sought workers' compensation benefits.

118.    Defendants did not renew Plaintiff's employment contract, canceled his insurance and other benefits and intentionally eliminated Plaintiff from public view.

119.    Defendants' unlawful employment practices caused Plaintiff to suffer damages including but not limited to lost income, lost benefits, humiliation, embarrassment, inconvenience, diminution of his public persona, emotional distress, and mental anguish.

120.    Defendants' deliberate retaliation against Plaintiff is unlawful, malicious, intentional, and was undertaken with reckless disregard for Plaintiff's legal rights.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages in the form of economic and non-economic damages, punitive damages, and such other relief as the Court may deem just and proper under the circumstances.

Respectfully submitted,

By/s/ Thomas B. Anderson, Esquire
    Thomas B. Anderson, Esquire
    Counsel for Plaintiff

    THOMSON, RHODES & COWIE, P.C.
    Firm #720
    Two Chatham Center, 10th Floor
    Pittsburgh, PA 15219-3499
    (412) 316-8684 (DD)
    (412) 232-3498 (F)
    tanderson@trc-law.com